STATE OF MAINE
Kennebec, ss.

Superior Court
Civil Action
Docket No. CV-2016-50

JENNIFER TAGHAVIDINANI,       )
                              )
            Plaintiff         )
                              )
      v.                      )
                              )
RIVERVIEW PSYCHIATRIC         )
CENTER, a division of the     )
State of Maine Department of Health )
and Human Services,           )
                              )
            and               )
                              )
JAY HARPER, in his capacity   )
as Superintendent of Riverview )
Psychiatric Center,           )
                              )
            Defendants        )

**FIRST AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL**

NOW COMES the Plaintiff, Jennifer Taghavidinani, and for her Complaint against the

Defendants states as follows:

### Parties

1.      Plaintiff, Jennifer Taghavidinani ("Jennifer"), is and was, at all times material

hereto, a resident of Oakland, Maine.

2.      Defendant, Riverview Psychiatric Center ("Riverview"), is and was, at all times

material hereto, a division within the State of Maine Department of Health and Human Services.

3.      Riverview employs approximately 4oo people and the Department of Health and

Human Services employs approximately 3200 people.

4.      Riverview received $10,000 or more in federal funds in all the years material to

this case.

5.      Defendant, Jay Harper ("Harper"), is and was, at all times material hereto, acting Superintendent of Riverview.

## Nature of Claim

6.      This is an action for declaratory and injunctive relief and damages to redress the deprivation of civil rights secured by the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §4551, *et seq.*; the Whistleblowers' Protection Act, (the "WPA") 26 M.R.S.A. §831, *et seq.*; the Americans with Disabilities Act, 42 U.S.C.A. §12101, *et seq.*; the Rehabilitation Act, 29 U.S.C.A. §701, *et seq.*; 42 U.S.C.A. §1983 and the Constitution of the United States.

7.      Plaintiff Jennifer Taghavidinani asserts that she was unlawfully discriminated against, harassed, threatened, retaliated against and otherwise subjected to adverse employment action because she engaged in protected activity, including blowing the whistle on unsafe and illegal practices at Riverview and engaging in constitutionally protected speech. Plaintiff also brings claims asserting her rights were violated against and she was the subject of unlawful discrimination, harassment and retaliation because she is disabled, or regarded as being disabled.

## Administrative Proceedings and Jurisdiction

8.      Plaintiff timely filed a complaint with the Maine Human Rights Commission and the Equal Employment Opportunity Commission under oath against Defendants alleging unlawful discrimination, and retaliation under both the MHRA and the WPA and the Americans with Disabilities Act.

9.      Plaintiff exhausted her administrative remedies.

## Demand for Jury Trial

10.     Plaintiff demands a trial by jury of all claims to the extent allowed by law.

## Facts

11.     On or about March 1, 2010 Jennifer was hired by Riverview to be an Intensive Case Manager.  Jennifer is a Licensed Social Worker (Conditional) in good standing and has always performed the functions of her job competently and professionally.

12.     Her job at Riverview is described as follows:

> This is professional services work in providing intensive case management for a targeted group of high risk mental health clients receiving services at Riverview Psychiatric Center ("RPC").  Responsibilities include acting as a single identifiable focus for service responsibility and functioning as the primary support in a comprehensive and individualized approach with all clients during their admission, comprehensive treatment planning process and discharge from RPC.  Work includes ensuring clients' basic living needs are being met; advocating for and/or assisting clients in gaining access to and maintaining medical, psychiatric, self-help, rehabilitation, social, educational, psychological and other necessary support services; and the intensive monitoring of clients' integration progress and overall service delivery.

13.     After her first full year Jennifer's Performance Evaluation reflected her very good work and a promising future treating Maine's most serious mentally ill citizens in a caring and professional way.  In addition to having excellent therapeutic rapport with clients, she was given outstanding grades for initiate, planning and organizing, and teamwork.  Her overall performance rating was "Exceeded Expectations".

14.     In 2011 Jennifer was diagnosed with cancer, specifically a type of leukemia, and was out of work under family medical leave for several months as she underwent treatment.

15.     When Jennifer returned to work in on or about July 11, 2011 she became the object of abusive and demeaning remarks from a coworker, who made fun of Jennifer's looks, referencing her baldness and weight gain, and otherwise bullied her at work.

16.     Specific examples of the treatment Jennifer complained about included, but are not limited to, screaming profanities at Jennifer, slamming doors, talking about Jennifer behind

her back to other colleagues and clients, interfering with Jennifer's therapeutic relationships with clients at Riverview, and purposefully exposing Jennifer to germs.

17.     During one particular meeting, this coworker, who had been out sick, was coughing all over the conference room where the meeting took place and when asked to wear a mask so as not to expose others, said, "I will show you a mask," and then looked right at Jennifer and purposefully touched every piece of pizza saying, "I like to share the wealth," knowing Jennifer's immune system was suppressed as a result of chemotherapy.

This coworker also called clients disparaging names on one hand ("Chicken Wing" and "Mental Retard"), and circumvented protocol for allocating her favored clients on the other.  She developed unprofessional relationships with clients that exceeded professional boundaries, saying, for example about a Riverview client, "he's my little baby...I just love him...and I know him so well," and demanding the client be given to her instead of Jennifer.  This coworker also pitted clients against Jennifer and others, taking advantage of their mental illness and manipulating them in a cruel and unprofessional way that caused anxiety for them and Jennifer.

18.     Jennifer reported this person's unprofessional, inappropriate behavior at work and its effect on her and Riverview patients to her supervisor and to the Human Resource Department, but instead of addressing the workplace controversy and conducting an investigation by H.R., they referred Jennifer to the Employee Assistance Program ("EAP").

19.     Riverview and the Department of Health and Human Services for the State of Maine often refer employees who have legitimate complaints about a work environment to the "EAP" and encourage them to ask for a "reasonable accommodation" in order to have access to the employee's medical file, and/or gain an excuse to transfer or terminate their employment.

20.     Riverview blamed Jennifer for her complaints and suggested she was being "overly sensitive" as a result of her cancer treatment and urged her to see a therapist.  This made Jennifer uncomfortable because (1) she had never been to a therapist in her life and did not believe "therapy" would prevent her coworker from ridiculing her appearance, infecting her with germs, shoving her, screaming at her, slamming doors and manipulating patients; (2) she was performing her job satisfactorily; and (3) if Riverview made any reasonable attempt to verify her complaints, it would benefit not only Jennifer but all the patients at Riverview who suffered the brunt of a dysfunctional environment.

21.     No meaningful steps were taken by Riverview to address Jennifer's concerns and the situation did not improve.  Riverview's tolerance of bullying, harassment and outrageous conduct on the part of certain employees had a significant adverse impact on Jennifer, several other employees and, most importantly, Riverview's patients.

22.     On October 26, 2011 and again on December 28, 2011 Jennifer filed formal written complaints with her Director and the H.R. Department at Riverview, a true copy of which is attached hereto as Exhibit A and incorporated herein.  In these complaints Jennifer detailed the several instances of misconduct directed towards her and the adverse impact.

23.     Riverview continued to avoid dealing with the very real workplace conflicts and instead pushed Jennifer to the Employee Assistance Program.

24.     On June 14, 2012, Jennifer submitted a Request for Reasonable Accommodation, a true copy of which is attached hereto as Exhibit B.

25.     On June 22, 2012 Jennifer's doctor sent to Riverview a Health Care Provider Questionnaire stating Jennifer had cancer and could perform the functions of her job absent bullying at work.  He noted, "if the patient is exposed to excessive bullying (at work) she could

suffer from progression of her leukemia and death." A true copy of this document is attached hereto as Exhibit C.

26.     In early 2013 the harassment, bullying and hostile environment at Riverview got much worse. There was staffing problems, mismanagement and lack of supervision. Certain Mental Health Workers who had worked there for many years—and many who were related— assumed authority and engaged in practices that were unsafe, unprofessional and damaging to patients. Dangerous behavior by the Unit Nurse Director of the Mental Health Workers, ("Supervisor CC") included bringing volatile forensic patients to the civil unit where Jennifer worked and providing one in particular with special, unauthorized privileges, such as food and electronic games. One such patient, CM, used a device wrongfully given to him by Supervisor CC to make a knife and cut himself severely, resulting in blood all over the unit and an unnecessary heightened sense of fear and danger in an already stressful place.

27.     This patient, CM, was such a favorite of Supervisor CC that she asked a young female colleague of Jennifer's to stand at his door so he could masturbate. This colleague and many others quit Riverview citing horrendous working conditions and an extremely hostile and dangerous environment.

28.     Supervisor CC and the Mental Health Workers (hereinafter sometimes "MHW") treated some patients with favoritism and interfered with the clinical work of Jennifer and other professionals. Supervisor CC and these Mental Health Workers were reckless and blatantly disregarded rules, policies and practices at Riverview which put Jennifer and everyone else in serious risk of harm. They interfered with her ability to do her job and disrupted her relationships with patients and staff. When Jennifer questioned this highly unprofessional

behavior, she was then targeted by a MHW, who began stalking her and spreading false rumors about her to others.

29.     One MHW in particular targeted Jennifer and stalked and bullied her at work in a threatening way, apparently miffed that Jennifer wanted to follow protocol and treat patients at Riverview professionally and within the bounds of standard protocols. Jennifer was followed, mimicked, disparaged, slandered and denied private time with her clients. Jennifer's duties were taken over, and she was purposefully undermined at meetings and with physicians. This MHW told clients at Riverview false information about Jennifer and encouraged them to file grievances that caused stress and anxiety and did not in any way help these people with their problems.

30.     In May, 2013 Jennifer again reported the mistreatment of herself and others, but the harassment and bullying only got worse.

31.     Supervisor CC and the "mob" of Mental Health Workers she was related to or very good friends with began a campaign to undermine Jennifer's job and cause disruption.  One MHW made the gesture of stirring the pot with her hands and said openly that Jennifer would not be working there much longer. Shortly thereafter Jennifer was first told to throw out receipts and then falsely accused of misappropriating funds – stealing from patients – but ultimately was exonerated after an investigation only because Jennifer had kept receipts.  Surprising, however, was that Riverview did nothing after learning the MHW made a false accusation and intentionally tried to destroy receipts and records that proved Jennifer's innocence.

32.     Later that fall, in October, 2013, the hostile and dangerous work environment created by Supervisor CC and the other Mental Health Workers got so bad, that Jennifer and another social worker filed a union grievance in addition to reporting directly to Riverview that the situation was becoming intolerable and dangerous to patients and staff.  In response, the

MHWs conspired with the Supervisor CC to get Jennifer fired, and suggested to their clients that they file grievances about Jennifer.

33.     Jennifer and the other social worker were ridiculed for reporting the conditions at Riverview, and the so-called "investigation" that ensued was used not to get to the bottom of the anarchy and dysfunction, but instead to retaliate against Jennifer.

34.     The environment at Riverview became increasingly hostile and dangerous, as described in several reports made to the news media, the legislature and the Special Court Master overseeing Riverview's compliance with a Consent Decree. There was severe staffing shortages, improper record keeping, medication errors, chaos, violence, patient abuse, the unlawful use stun guns, pepper spray and handcuffs; neglect and hostility.

35.     As a result of deficiencies and substandard care and administration, Riverview lost its federal funding in 2013, and then failed repeatedly to get it back and missed the deadline to appeal.

36.     Patients with violent criminal records were coddled by the Supervisor CC and the Mental Health Workers, while professionals like Jennifer, who wanted to follow rules and professional protocols, were mocked, isolated and bullied.

37.     In December of 2013 a Corrections Officer, with the approval of a nurse at Riverview, pepper sprayed a naked female patient, who was then left for hours in restraints screaming in pain despite the fact that this patient had been compliant and not threatening staff. This incident should have been immediately reported and investigated according to Riverview policy and the law, but it was not.

38.     The Supervisor CC knew about the pepper spray incident, didn't report it and tried to cover it up. The MHWs also knew and failed to report.

39.     When one employee, Director JC, finally did report the pepper spray incident, she was fired. Jay Harper, the Riverview Superintendent, then told others, "Jennifer's next."

40.     Jennifer became fearful for her job, and the egregious incidents at Riverview continued. She was especially fearful of the patients like CM who were inappropriately assigned to her unit when they obviously should have been on a more restricted unit due to violent temperament and illness. Jennifer reported this specifically to the Superintendent and all her supervisors but CM remained.

41.     Favored patients such as CM were placed on the civil unit of Riverview where Jennifer worked when they clearly should have been on the forensic units reserved for the violently mental ill. Jennifer was not trained or equipped to deal with these violent offenders, but the Supervisor CC and the MHWs used their influence to make inappropriate placement decisions and took pleasure in Jennifer's fear and anxiety.

42.     Because there was no appropriate or adequate response to Jennifer's union grievance or written and verbal reports of unsafe and unlawful activity, she again reported to her supervisor in January, 2014 practices committed by the Supervisor CC and the Mental Health Workers that were dangerous, unprofessional and created a hostile work environment. Patients continued to be purposefully placed based on the whims and personal preferences of Supervisor CC and the MHWs instead of sound professional guidelines, putting Jennifer, staff and patients at risk of harm. In addition, Jennifer was bullied, called names and mistreated.

43.     At first Jennifer was told the most egregious MHW who had been harassing and bullying her would be removed from the Lower Kennebunk unit, but that didn't happen.  The Nursing Director, JC, told Jennifer her efforts to remedy the situation, to her dismay, were blocked by the Supervisor CC.

44.     Jennifer continued to be stalked by the Mental Health Workers whom she had reported, and no one would talk to her or communicate in a way that served her patients.

45.     On or about April 7th, Jennifer again complained formally and reported the Supervisor's unprofessional conduct as it related to Patient CM that was putting everyone at Riverview in risk of serious bodily harm. CM was a violent patient and should not have been on Jennifer's unit or given sharp things. The recklessness of Supervisor CC and the MHWs was putting everyone's safety at risk, was unlawful and caused extreme fear and anxiety – adding to what was already a hostile work environment.

46.     Patient CM, on one occasion, used the sharp instruments provided to him by Supervisor CC and the MHWs to cut himself severely, leading to blood being all over the unit, causing significant anxiety and fear for Jennifer and staff.

47.     On or about May 12, 2014, a sex toy was mysteriously placed on Jennifer's unit at Riverview over a weekend when she was not working.  It was suggested that Jennifer was responsible, which was ridiculous and a blatant act of retribution for making reports of unsafe and unlawful activity.

48.     The next day the Supervisor CC requested that Jennifer's notes and Meditech documents be audited, and Jennifer was falsely accused of breaching protocol in another act of retribution and retaliation.

49.     On May 14th, Jennifer was abruptly told she was being moved from her job and placed on the "ACT" Team.  She was told the reason was, in part, because she had asked for an accommodation that included a safe work environment free from bullying and harassment. In fact this was retribution and retaliation for reporting unlawful and unsafe activities and practices at Riverview. Her request for an accommodation – which she really didn't want to ask for in a

medical sense in the first place – was being mocked and used against her by the Supervisor CC and the Superintendent.

50.     On May 14, 2014 Jennifer was informed her union grievance was denied.

51.     On May 16, 2014 Jennifer was handed a letter (dated May 12, 2014) stating that Riverview had "probable cause" to conduct an investigation into allegations of a hostile work environment and that, effective immediately, Jennifer would be transferred.  She was ordered not to speak to anyone at work and threatened that if she did, she could be found guilty of retaliation. Jennifer's complaints were being turned against her, and she suddenly become the person being investigated.

52.     On May 19, 2014 Jennifer was locked out of her unit and stripped of access keys, computers and phones.  At one point, she and a colleague were locked in a stairwell at Riverview and had to bang on the door to be let out.  Jennifer was told she could not use the employee entrance and could not leave the building.  Her life was in danger, but repeated urgent emails to the Superintendent at Riverview were ignored.

53.     On May 20, 2014 Jennifer was ordered to pack up her office and was escorted to a building on Chestnut Street that was being renovated.  The paint and carpets were new and they were off-gassing and other noxious smells were coming from the dust in the ventilation system from the renovations which made her sick—at a time when her immune system was compromised due to a cancer diagnosis.

54.     On May 26, 2014 Jennifer submitted a formal complaint to the Office of Professional Evaluation and Government Accountability ("OPEGA") about the unsafe, unprofessional, hostile and what she reasonably believed to be illegal and highly inappropriate goings-on at Riverview.

55.     On June 12, 2014 Jennifer met with OPEGA and provided information and details about the reports made in her complaint.

56.     On or about June, 2014 Jennifer and several colleagues spoke to the press about what was going on at Riverview because their concerns were so great and Riverview was not responding in any reasonable of effective way putting the staff and patients at serious risk.

57.     It was reported to Jennifer that the Superintendent became aware of Jennifer's reports to OPEGA and the press, and he said he wanted to get Jennifer out of the hospital so they wouldn't talk to the press anymore.

58.     On June 19, 2014, Jennifer was ordered to report to a location on Anthony Avenue, with absolutely no work to do or explanation as to why she was there.

59.     One of several stories that documents Jennifer's complaints and the complaints of others was published in the Kennebec Journal on July 21, 2014. A true copy of the article is attached hereto as Exhibit D.

60.     From June 19, 2014 until August 8, 2014 Jennifer was holed up in a cubicle with nothing to do, under express orders to speak with no one under threats of discipline or discharge. It was akin to solitary confinement and extremely stressful and emotionally painful. There was no computer, no phone, no work to do and nobody spoke to her.

61.     During this period, Jennifer learned that the Superintendent, the Supervisor CC and Riverview were trying to fire her because of her reports of unsafe and illegal conduct being committed there, and in retaliation for bringing to light reckless mismanagement and staggering incompetency and abuse.

62.     Riverview claims the MHWs were also removed from Riverview but that's not true. Only Jennifer and a colleague that reported unlawful and unsafe activities were removed.

63.    On July 3, 2014 Jennifer received a threatening letter from the Human Resource Manager at Riverview falsely accusing her of misusing case management time, misuse of a state vehicle and taking a client on personal business -- all of which was untrue.  A meeting was scheduled for July 9th.  The letter stated the meeting could lead to discipline or termination.

64.    On July 8, 2014 Jennifer received a threatening letter from the HR Manager at Riverview that reminded her she was to speak to no one at Riverview about the false charges against her, and that if she spoke to anyone at Riverview about anything she would be in violation of Riverview's policy LD 40.4.3 "Behaviors That Undermine a Culture of Safety" and could be considered insubordination and/or retaliation.

65.    Jennifer had done nothing wrong.  What she did was report an unsafe, egregious, abusive and unprofessional hostile work environment.

66.    On August 4, 2014 Jennifer received an email from the Human Resource manager, telling her she needed to see her at that time or she would be written up.

67.    Even though Jennifer had been removed from her job against her will and holed up alone without contact with anyone for months, on or about July 17, 2014 she suddenly received a "performance evaluation" that was critical of her "work" and that accused her of causing "conflicts" at Riverview when in fact, she had only reported blatantly dangerous, hostile and unprofessional conduct of others.

68.    The negative performance evaluation caused Jennifer to lose income because she was denied a step increase.

69.    On or about August of 2014 CM, the Supervisor's favored patient who had been the subject of Jennifer's report and complaint to several high level officials at Riverview, ran amok in the hospital and threatened to kill Riverview employees and caused millions of dollars

of damage in a fit of rage. The incident was widely reported in the media and the scrutiny of Riverview intensified.

70.     Riverview made several attempts to fire, transfer or otherwise get rid of Jennifer by manipulating the "accommodation" process, creating trumped up charges and creating a false narrative that there was a "personality conflict" between Jennifer and the Supervisor and the MHWs that went both ways. At no time, however, was Jennifer ever informed that anyone had ever lodged complaints against her.

71.     After desperately pleading to be released from solitary confinement to a cubby, Jennifer finally returned to Riverview on August 11th, but her key card did not work; the phone was shut off as was her computer. She was told to go to Lower Saco, the most violent Unit. She had not worked on forensics and had no training; nobody spoke to her. She went to the Housekeeping Supervisor and asked where her name placard that had been on her office door was. The woman said, "It was thrown out; you were fired." Jennifer had no chair to sit on until almost 1 p.m. Whoever passed her in the hallway diverted their eyes from her. Nobody spoke to her.

72.     The next day there was still no phone or computer so Jennifer could not do any work. While on Lower Saco, a patient charged her to attack her. Jennifer reasonably feared the patient was encouraged to act out against her by the MHWs and/or Supervisor CC. A MHW shoved Jennifer backwards to block the patient. Jennifer was petrified. She had not been on a Forensic Unit before; nobody had trained her. She did not know these patients. She reasonably believed this was another punishment by the Superintendent and the Supervisor CC.

73.     A coworker spoke to Jennifer in the afternoon. She told Jennifer that at every meeting of social workers, the Superintendent bad mouthed Jennifer and the other colleague who

had reported misconduct. This coworker said, "He gave us a play by play as to what was going on with you two. He told us all about what JD did and why she was fired."

74.    On August 13, 2014, Jennifer still had no phone or computer—and could not do anything meaningful. Due to an upcoming surgery, Jennifer needed to take a short FMLA leave and had made the appropriate requests. The Superintendent, in a meeting of social workers, announced to everyone that Jennifer would be out on medical leave, and then looked at her and said, "So, Jennifer, how long will you be out?" Jennifer felt the Supervisor was purposefully disclosing private medical information as another way to punish her. She had not wanted that to be brought up in a room full of coworkers.

75.    On August 13th, a Riverview employee from the Business Office called Jennifer on her State-issued cell phone. This person said, "Jennifer, I need you to turn in your State cell phone." Jennifer asked why, and the woman replied, "What do you mean 'why'? You have been fired." Jennifer told her "I am sitting in my office." The woman did not know how to respond and said, "I will call you back."

76.    On August 14, 2014 Jennifer went out on FMLA for surgery.

77.    On August 28, 2014 she again met with OPEGA and members of the Maine Legislature about her complaint and other reported problems at Riverview.

78.    After waiting for more than a month for her FMLA approval, Jennifer emailed the HR Manager on September 18th to ask her if she had been approved since she had never received the paperwork. The HR Manager emailed an attachment and had dated the paperwork August 21. It had the wrong dates, years, staff people and addresses on it. She also told Jennifer what vacation, sick, comp and personal time she had. She later found out none of the information was accurate.

79.     On September 29, 2014 Jennifer met with Daniel Wathen, a former judge charged with enforcing a court order to protect patients at Riverview, and reported to him what her experience had been of reporting unsafe, unprofessional and illegal conduct.

80.     The Superintendent and Riverview did everything they could to prevent Jennifer from returning to her position. They gave her a bureaucratic runaround with endless forms and emails and talk about "accommodations" and other HR jargon, again trying to pigeon-hole Jennifer as "disabled" and unable to do her job, when in fact she was a qualified person with a disability or regarded as having a disability who could do her job with reasonable accommodation.

81.     Riverview continued to attempt to force Jennifer out of her position or fire her in retaliation for bringing outrageous practices and incompetency to light.

82.     On October 27, 2014, Jennifer returned to Riverview only after her lawyer sent a letter demanding her return following approved FMLA leave.  Jennifer was assigned to Upper Saco, a Forensic Unit.  Walking into the building and in the hallways, nobody made eye contact with her, heads turned, etc.

83.     At the social workers meetings, none of the other social workers spoke to Jennifer and tried to avoid eye contact.  90% of the hospital did not speak to her and avoided eye contact; including doctors, psychiatrists, psychologists, the Chaplain and many others. Jennifer had been reported to be one of the whistleblowers and was being punished.

84.     On November 12, 2014, Jennifer met with her supervisor.  They went over her revised performance evaluation from July.  When Jennifer asked what it was that she had done wrong to get a negative remarks on her performance evaluation, she was told that "you know— there's a long list of things that JC provided in a meetings."

85.     Later from home Jennifer asked JC whether there was ever a list of things she had done wrong to the MHW's.  JC said "no" and denied ever giving any such list.

86.     On November 19, 2014, during a meeting with her Supervisor SG-R, Jennifer said to her, "I still to this day do not know why I was sent out of the hospital," and SG-R said that she had done things just like the MHW's did; that we were both responsible.  Jennifer replied, "No, I have spoken to Director JC; that is not true."  The supervisor then said, "Yes, it is and it was Director JC who had you and JD locked out of the hospital."

87.     Supervisor SG-R said Director JC went to the Superintendent and told him Jennifer was speaking to OPEGA, the Joint Commission and the newspaper about the unsafe, unlawful and reckless activity at Riverview.  Supervisor SG-R then said the Superintendent called her in and told her, "JD and Jennifer are going to report us so we are getting them out of the hospital."

88.     Since 2013 Jennifer has have suffered extreme anxiety, sadness, frustration and despair because of the way she was treated at Riverview by the Superintendent, the Supervisor CC, the HR Manager and the MHW's. Riverview failed repeatedly to respond to reports of unsafe and illegal practices made in good faith in the interests of the patients and staff.

## Count One – Violation of Whistleblower Protection Act

89.      Plaintiff realleges and hereby incorporates by reference the paragraphs set forth above as if set forth here in their entirety.

90.     Defendants intentionally discriminated against and retaliated against Jennifer with respect to tenure, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment because of previous actions taken by her that are protected under the WPA, in violation of 5 M.R.S.A. §4572(1)(A).

91.     Jennifer reported to Defendants what she had reasonable cause to believe was a violation of state or federal law – namely the intentional misplacement, reckless care and inappropriate treatment of patients at Riverview.  26 M.R.S.A. §833(1)(A)

92.     Jennifer reported to Defendants what she reasonably believed to be conditions or practices that put at risk the health and safety of patients and staff at Riverview when she reported the intentional placement, treatment, manipulation and care, as well as abuse, of patients and the bullying and harassment of staff who complained.  26 M.R.S.A. §833(1)(B)

93.     Jennifer reported to Defendants what she had reasonable cause to believe were acts or omissions that constituted deviations from the applicable standard of care for patients at Riverview, reporting that patient CM was placed on the civil unit when he was known to be violent and dangerous and given special treatment by Supervisor CC and the MHW's, for example, when Defendants were charged with care of those patients.  26 M.R.S.A. §833(1)(E)

94.     Jennifer reported to Defendants what she reasonably believed to be neglect of patients in the form of essential needs by bringing to their attention several times the inappropriate boundaries, special treatment, reckless supervision and intentional manipulation of patients by Supervisor CC and the MHWs.  26 M.R.S.A. §833(3).

95.     As a proximate result of Defendants' unlawful conduct alleged herein, Jennifer has suffered the temporary loss of her job, lost income, emotional distress, loss of enjoyment of life, inconvenience, pain, fear, anxiety and other pecuniary and non-pecuniary losses.

96.     Jennifer has no plain, adequate or complete remedy at law to fully redress the wrongs alleged, and Defendants are likely to perpetrate similar acts on others unless they are enjoined by this court.

97.     Defendants' unlawful acts described herein were intentional.

98.     Defendants' unlawful acts described herein were undertaken with malice or with reckless disregard to Jennifer's rights.

## Count Two – Retaliation – MHRA

99.     Plaintiff realleges and hereby incorporates by reference the paragraphs set forth above as if set forth here in their entirety.

100.     Defendants intentionally coerced, intimidated, threatened or interfered with Jennifer in the exercise or enjoyment of her rights under the MHRA in violation thereof pursuant to 5 M.R.S.A. §4633.

## Count Three - Violation of MHRA and ADA – Disability

101.     Plaintiff realleges and hereby incorporates by reference the paragraphs set forth above as if set forth here in their entirety.

102.     At all material times, Jennifer was a qualified person with a disability, namely cancer, (specifically a type of leukemia), or is regarded as having a disability.

103.      Jennifer is otherwise qualified, with or without reasonable accommodations, to perform the essential functions of this job.

104.     Defendants adversely treated her based in whole or in part on her disability, or Defendants perception of her disability when they refused to take her legitimate complaints of an increasingly hostile, abusive and dangerous work conditions seriously, and instead repeatedly referred her to "therapy" or the EAP, and continuously tried to get her to transfer from Riverview on the pretext of her disability when in fact it was in retaliation for blowing the whistle and otherwise reporting unlawful and unsafe working conditions.

105.     Defendants discriminated against Jennifer on account of her disability of perception of a disability when they assumed she was not fit to work at Riverview when in fact

no reasonable person – disabled or not – could be expected to tolerate such dangerous, abusive, chaotic and hostile work environment.

106.    Defendants also harassed and discriminated against Jennifer on account of her disability when they tolerated name-calling ("fat and bald") and bullying by the Supervisor CC and the MHWs, for example the MHW purposefully touching food when she was sick knowing Jennifer's immune system was compromised.

### Count Four - Violation of the Rehabilitation Act

107.    Plaintiff realleges and hereby incorporates by reference the paragraphs set forth above as if set forth here in their entirety.

108.    Jennifer was subjected to unlawful discrimination at Riverview, a program or activity receiving Federal financial assistance.

109.    The unlawful discrimination by Defendants caused significant and ongoing damage.

110.    At all material times, Plaintiff was a qualified individual with a disability.

### Count Five - Violation of Free Speech Rights

111.    Plaintiff realleges and hereby incorporates by reference the paragraphs set forth above as if set forth here in their entirety.

112.    Jennifer engaged in constitutionally protected speech when she spoke to OPEGA, legislators, the news media and/or the Special Master and Joint Commission.

113.    When reporting unlawful, unsafe, abusive and highly dysfunctional conditions at Riverview, Jennifer was speaking as a citizen on a matter of public concern.

114.    The protection of Jennifer's speech about the working conditions and patient treatment outweighs any legitimate interest of Riverview as an employer.

115.   Jennifer's protected speech was a substantial or motivating factor in the adverse employment action taken against her by the Defendants.

WHEREFORE, the Plaintiff respectfully requests the following relief:

A.   Enter judgment declaring that the Defendants' practices complained of herein are unlawful;

B.   Grant Jennifer a permanent injunction enjoining the Defendants, its officers, agents, successors and assigns from engaging in any employment policy or practice which retaliates further against Jennifer for exercising her rights under the WPA of MHRA;

C.   Order Defendants to make Jennifer whole by providing reimbursement for lost pay and any related benefits;

D.   Order Defendants to pay Jennifer compensatory damages;

E.   Order Defendant Harper to pay punitive damages;

F.   Order Defendants to pay civil penal damages pursuant to 5 M.R.S.A. §4613(2)(B)(7);

G.   Order Defendants to pay Jennifer nominal damages;

H.   Order Defendants to pay pre-judgment and post judgment interest, reasonable attorney's fees and costs; and

I.   Grant such other and further relief as this Court deems just and appropriate.

DATED at Portland, Maine this 29th day of March, 2016.

Cynthia A. Dill
Maine Bar No. 7055
Attorney for Plaintiff Jennifer Taghavidinani

TROUBH HEISLER, PA
511 Congress Street, 7th floor
PO Box 9711
Portland, ME 04104-5011
Email:  cdill@troubhheisler.com
Tel:  207-780-6789

10/26/2011

I am hereby notifying you of the inappropriate and unprofessional behavior directed towards me from a coworker which is in clear violation of RPC's policy LD 4.40.3- Disruptive Behavior.

I have suffered abusive and demeaning treatment from co-worker since I returned from FML on July 11, 2001. This is mental and emotional abuse and a form of workplace harassment.

has slammed doors, used profane language to me, has made demeaning comments by calling me names to other staff members and has made degrading abusive and sarcastic comments to me and to other staff about me which I have overheard. These are only some of the examples of what I have endured.

I reported some of the abuses about a month and a half ago. It has only gotten worse for me. I do not speak to ...... and the reason is that she is sarcastic and demeaning towards me. I have given up trying.

I am under so much stress due to having to deal with this everyday. I have had to keep my office door shut because of and I have been intimidated by her behavior and now feel like I am in prison in the workplace.

I am requesting help with this situation.


Jennifer Taghavidinani

EXHIBIT

A

Issues with co-worker beginning the month I returned to work after 6 months of chemo treatment for leukemia, July 11, 2011

8-11-11

_____ took our co-worker to the hospital for chest pain. She came back and started to speak to me but when I did not immediately look up, she said in a very loud voice in the hallway outside my office, "Fine, I will never fucking speak to you again." I said "fine" and she slammed her office door.

8-11

I overheard _____ talking to an unknown male in her office and complaining of working with someone who is "fat and bald". I was sure she was talking about me and have been upset about this every since.

9-11

In rounds, _____ tried to humiliate me about taking two clients to Walmart. They had used their EBT cards to purchase snacks. _____ said it was illegal and it never should have happened. Also made it her business to say one of the clients was 1:1 and shouldn't have gone. Both clients were mine. This did not concern her at all.
_____ has frequently made everything her business: when I am asked a question in rounds she talks right over me and answers questions addressed to me.

9-11

During a social work staff meeting in Belgrade room, she had been out sick and was coughing all over the conference room. Somebody said she better not get them sick and should be wearing a mask. _____ looked at them and said "I will show you a mask". She then looked at me and replied 'I like to share the wealth" then purposely touched all the slices of pizza with her finger. She knows I have a suppressed immune system.

2011-2012

_____ calls clients disparaging names; chicken wing (AB), mentally retarded (CR), crab hands KA, her hair cut looks terrible (ET), said that a female client looks like a man (ME).

10-17

Client WR was admitted, the RN gave me the admitting packet, I made contact with the client, emailed his CM, _____, on the ACT team and informed him of date of 7 day team meeting, typed the plan and put a note in Meditech on 10-19. I passed a note to Sam in Peer Support to ask if she could do the 48 hour with me at 11am. _____ bent over to read my note and said loudly 'I have him". I said I don't think so _____ gave me his admitting packet two days ago. After rounds she ran up to Stephanie, social work director, and told her the unit assigned her WR (the unit never assigns) and I was made to give her WR. She also did this with another client that I spent several hours getting her probate guardianship records as requested by Dr. Dettmann. She tired again to get a young male client that she had had previously by trading with _____. She did not succeed in getting this client however. She tried to dispute this on the number of clients _____ and I had but _____ said, we don't take clients on the basis of liking them or having had them before. _____ pushed herself away from the table and said about MM "he's my little baby…I just love him…and I know him so well".

10-21

As I was going into the bathroom and had my hand on the door handle. She said "Are you going in there?" I said I was and she said "I swear, some fucking people".

10-24

Whispering to Sam of Peer support in her office and all I heard was my name and I can usually hear everything through her wall.

10-25

I heard her talking to          as he was putting up her name sign. "Oh, I am not leaving but someone else is leaving real soon."

10-27

Discussing MM in rounds, I was talking, she spoke up an started taling over me and said "that's why social workers should be switched to someone that knows all about him." She started rolling her eyes and looked a the treatment team coordinator. She also made a point of correcting everyone on the pronunciation of his last name including, nurses, doctors and myself.

11-11

              , a social work intern, said that          has been rude to her; treats her likes she is dumb; talks at her not to her; told her she didn't need her help.          told          and I but did not want to say anything to anyone else since she was just here for this school year. She worked exclusively with us and with our patients after that.

2011-2012

          has slammed her office door on many occasions when she is mad at something I have said or done rather than discussing it with me professionally.

1-12

While I was out for a yearly chemo treatment for the month, my coworker          told me          had complained in rounds in front of 12-18 colleagues of mine that "nothing has been done in 3 months here" for a young male client who had been mine and she was covering. She made a point of saying she had his SS card and birth certificate and was going to help him get his driver's license back. When the client's doctor came back from vacation the following week she said this again in rounds. The doctor said that it was certainly not necessary to help him with this as he has parents who can do this for him and instructed her not to do it.          went to our director to complain that she was disparaging my work in front of my team members.

I took these issues to my director and HR and their response was to send me to EAP. I was not at all comfortable with going to a therapist as I have not done so ever in the past. I feel like all these issues have been blamed on me being "overly sensitive" or "not quite ready to come back to work" due to my cancer.

Ostensibly,          was also asked to go to EAP and then it was said that we would get together to discuss the issues. This never happened. The environment has never improved and my response has been to keep a low, quiet profile. But the abuse and harassment continue with very little support from HR, my director in resolving it other than one meeting last week.

12/28/11

Stephanie,

The fact that you are asking me to write these things down for you rather than talking to me about it is very disturbing. Especially since I clearly heard your phone call to                    this morning a few minutes before 8am and the pack of lies that she was feeding you.

This is another indication that I can not speak to you openly about these things because you will not speak to me openly about them to get the information from me. I make a complaint and you don't speak to me you speak to the perpetrator. That's like the cops going to the robber rather than the home owner for info after a robbery. You seem to have taken sides and it does not feel good to me at all. I do not feel like you, HR or the hospital has done anything about my written concerns other than force me to go to an EAP counselor.

Tuesday Rounds 12-27-11

1. Dr Dettmann had been on vacation for 1 week. When it was time to discuss clients and we were on VS, Dr. Dettmann looked at me and said "where are we with discharge" I started to say VS had called                the CM when all of a sudden          started talking about      ..            and VS, shutting me down. I looked at Dr. Dettmann and said I will talk to you later about it.

2. Conversation about JL and his bank account being froze. Dr Dettmann said he got a note from Dr Filene that Jay Harper had come to him to discuss JL's money issues and wanted to know what I knew. I told Dr Dettmann this was the first I heard of it.        said oh I know all about it and spoke to Jay about it. Jay probably didn't come to me because she discussed it with him and he probably thought she was the Social Worker.

3. This is on top of me going to do the 48 with my client M. Mc a few weeks ago and I find the client sitting and talking with      ·  ·        in the dayroom. When I asked her if we could meet she said," no I am talking to my social worker right now"          _ didn't correct her that I was her social worker or even excuse herself to leave. She has to be in on everything. Even Dr. Dettmann said to me yesterday, "she is a busybody isn't she". She takes the clients to the ER? This has happened twice recently. Is that a social work job? She goes through the client's mail and distributes it. Is that social work responsibility. She is down behind the nursing station handing out snacks half the time. She will do anything to ingratiate herself with the clients or staff because she has this insatiable need for a pat on the back. And then she tries very hard to make the rest of us look like we are not doing our jobs. She does it to        too, ask her.

Jennifer Taghavidinani

# EMPLOYEE'S REQUEST FOR REASONABLE ACCOMODATION(S)

Employee Name: _Jennifer Tashjianidinani_   Home phone: _620-0366_

Address: _250 Arsenal St   Augusta ME 04330_

Job Class Title: _Social Worker_

Work Location: _Riverview_   Agency/Bureau: _State of ME_   Work Phone: _624-4710_

Employment status (circle):   (Full Time)   Part Time   Seasonal   Applicant

******************************************************************************

Nature of impairment / condition: _Leukemia   Stress   Anxiety_

Do you have any of the following conditions?  If so, please circle the appropriate condition(s):

| | | |
|---|---|---|
| Acquired Brain Injury | Alcoholism | (Cancer) |
| Amyotrophic Lateral Sclerosis | Bipolar Disorder | Crohn's Disease |
| Blindness or abnormal vision loss | Cerebral Palsy | Cystic Fibrosis |
| Major Depressive Disorder | Lupus | Epilepsy |
| Deafness or abnormal hearing loss | Diabetes | HIV or AIDS |
| Substantial disfigurement | Heart Disease | Mastectomy |
| Kidney or Renal Diseases | Mental Retardation | Paralysis |
| Multiple Sclerosis | Muscular Dystrophy | |
| Pervasive Developmental Disorders | Parkinson's Disease | |
| Rheumatoid Arthritis | Schizophrenia | |
| Chronic Obstructive Pulmonary Disease | | |
| Absent, artificial or replacement limbs, hands, feet or vital organs | | |

Date that impairment/condition began: _12/28/10_

Anticipated duration of the impairment/condition, including whether the impairment is current, episodic, or in remission: _Unknown_

Please list special education, vocational rehabilitation or related services, if any, that your impairment/condition requires: _Stress free environment_

Please circle any of the following major life activities are affected by the impairment.

| | | | |
|---|---|---|---|
| (Walking) | Speaking | Breathing | Caring for Oneself |
| Hearing | Seeing | Thinking | Communicating |
| Reading | Standing | Reaching | Interacting with Others |
| Learning | Lifting | Concentrating | Performing Manual Tasks |
| *Working | (Sleeping) | Eating | Bending |

**Major Bodily Functions (Describe)
Other (Describe) _Anxiety   Stress   PTSD_

*If working is an activity affected by the impairment, please indicate the specific tasks or duties of your work that are affected by the impairment, and what functions you are still able to perform.*

**Major Bodily Functions include, but are not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.*

Page 1 of 2

EXHIBIT

B

PENGAD 800-631-6989

I am requesting the following accommodations or modifications to my employment:

I am requesting a work environment that is free from Abuse, Bullying, harassment free non-hostile, Slander free & stress and anxiety free.

I am not only dealing with Leukemia and Chemo treatments, but stress due to the environment I am in, due to co-worker sickness, severity. I have been requesting help with this situation for almost a year to no avail.

Please see attached documents.

Healthcare provider's name(s), addresses(es), phone and FAX number(s):

_____

_____

_____

_____          Date: 6/14/12

Signature of Employee

Request Received By: _____          Date: _____

Dr Jens Reuter
33 Whiting Hill Rd
Suite 21
Brewer ME 04412
973-7478  Fax 973-7459

Revised 4/09

Barbara Granville LCSW
295 Water St Suite 11
Augusta ME 04330

933-6916

Page 2 of 2

## HEALTH CARE PROVIDER QUESTIONNAIRE
### FOR THE PURPOSE OF PROVIDING REASONABLE ACCOMMODATION

Employee Name: _Jennifer Taghavidiani_

Employee's Position: _____

IMPORTANT NOTE TO HEALTH CARE PROVIDER: When answering these questions, please do not take into consideration any ameliorative effects of mitigating measures, such as medications, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies; use of assistive technology; reasonable accommodations or auxiliary aids or services; or learned behavioral or adaptive neurological modifications.

Does the employee have a physical or mental **impairment**?   Yes  __✓__   No ____
*(An impairment is a physiological disorder affecting one or more body systems, or a mental or psychological disorder, including, but not limited to, the conditions listed below.)*

If yes, what is the impairment? _has Cancer — ALL_

Please circle any of the following conditions, without regard to severity, unless otherwise indicated, that the employee may have.

Acquired Brain Injury
Amyotrophic Lateral Sclerosis
Blindness or abnormal vision loss
Major Depressive Disorder
Deafness or abnormal hearing loss
Substantial disfigurement
Kidney or Renal Diseases
Multiple Sclerosis
Pervasive Developmental Disorders
Rheumatoid Arthritis
Chronic Obstructive Pulmonary Disease
Absent, artificial or replacement limbs, hands, feet or vital organs

Alcoholism
Bipolar Disorder
Cerebral Palsy
Lupus
Diabetes
Heart Disease
Mental Retardation
Muscular Dystrophy
Parkinson's Disease
Schizophrenia

(Cancer)
Crohn's Disease
Cystic Fibrosis
Epilepsy
HIV or AIDS
Mastectomy
Paralysis

Is the employee currently impaired, or is the impairment episodic or in remission? _has cancer_

What is the anticipated **duration** of the impairment? _another year at least_

If the actual or expected duration is more than six months, does the condition impair the employee's physical or mental health to a significant extent as compared to what is ordinarily expected in the general population?   Yes  __✓__   No ____

If yes, please describe how the impairment impairs the employee's physical or mental health
_pt is at high risk of infection and should not be_
_under chronic stress_

Does the impairment require special education, vocational rehabilitation or related services?
Yes ____   No  __✓__   If yes, please describe: _____

Page 1 of 2

EXHIBIT

C

PENGAD 800-631-6989

Please circle any of the following major life activities are affected by the impairment.

Walking
Hearing
Reading
Learning
(Working)
*Major Bodily Functions (Describe)
Other (Describe) _STRESS THROUGH BULLYING AT WORK_

Speaking
Seeing
Standing
Lifting
Sleeping

Breathing
Thinking
Reaching
Concentrating
Eating

Caring for Oneself
Communicating
Interacting with Others
Performing Manual Tasks
Bending

*If working is an activity affected by the impairment, please indicate the class of jobs, or broad category of work, which is affected by the impairment.

**Major Bodily Functions include, but are not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

Does the impairment substantially limit the employee's ability to perform such major life activities?
Yes ___✓___  No _____

For each major life activity that is limited by the impairment, please describe how the employee is restricted as to the condition, manner, or duration under which that activity can be performed, as compared to the way in which an average person in the general population can perform that activity:

_____
_____

Based on your understanding of the employee's job requirements, please assess whether the employee can perform all job functions:  Yes ___✓___   No _____

If not, which job functions cannot be performed, and why not?
_AGAIN, EXCESSIVE BULLYING AT WORK COULD ADVERSELY_
_AFFECT OUTCOME OF ALL (acute lymphoblastic leukemia)_

What reasonable accommodation(s), if any, would you recommend for the employer to consider in order to enable the employee to work? _PROVIDE EMPLOYEE WITH A SAFE WORK_
_ENVIRONMENT_

Would performing any of the job functions result in a direct safety or health threat to this employee or other people (co-workers, members of the general public, etc.)? Yes* ___✓___   No _____

* If yes, please describe:

(a) which job function(s) would pose such a threat: _IF THE PAT. IS EXPOSED_
_TO EXCESSIVE BULLYING, SHE COULD SUFFER_
_FROM PROGRESSION OF HER LEUKEMIA AND DEATH_
(b) the direct safety or health threat posed: _____

(c) any reasonable accommodations that would eliminate or reduce such threat: _____

Printed Name  Jens Rueter, MD

Date _6/22/12_

Occupation _ONCOLOGIST_

Signature _____

**Please Fax to DHHS EEO Coordinator @ 287-8299**
Revised 9/09
Page 2 of 2



# KENNEBEC JOURNAL

centralmaine.com

Maine's Oldest Newspaper | Founded in 1825



79° Sunny — WEATHER A6

**Monday, July 21, 2014**
Copyright 2014
$1.00

## Riverview workers air discontent, cite hostile work environment

### Former, current workers say they reported problems to directors, administrators, unions but failed to get help

By BETTY ADAMS
Staff Writer

AUGUSTA — Four current and former workers at Riverview Psychiatric Center say serious staffing problems continue at the 92-bed state mental health hospital, which last September lost federal certification and $20 million in funding.

The worker complaints, outlined in recent interviews with the Kennebec Journal, offer new insight into staff discontent at the beleaguered hospital, which has come under fire about how dangerous patients are handled and other safety concerns. The Centers for Medicare and Medicaid Services, or CMS, revoked Riverview's certification on Sept. 2 last year based on inspections, including the disclosure that Kennebec County sheriff's deputies had used stun guns and handcuffs to control

patients in the state-run hospital.

In October, five female social workers at Riverview Psychiatric Center formally complained that they were subject to a hostile work environment that included bullying by fellow employees and claiming that "significantly decreased productivity and wasted state resources." The women told the Kennebec Journal in a recent interview that they reported various staff prob-

lems at Riverview and failed to get assistance from directors and administrators at the state hospital and from other sources.

Much of their discontent centered around the portion of the hospital designated for civil patients, those who are not there in connection with a criminal case.

By May, the two women who filed the

RIVERVIEW, PAGE A4





DAWSON    DORSEY    ASHLOCK

### LOCAL
A West Athens farm is growing its herbal medicine business. **B1**

### SPORTS
Steve Park, Derek Kneeland compete in Oxford 250. **C1**

Around Our State

UV Index

www.WhatsOurWeather.com
UV Index for 3 periods of the day.

EXHIBIT
D

Monday, July 21, 2014 | Kennebec Journal

# Riverview

**CONTINUED FROM PAGE A1**

complaints were transferred out of the state mental health hospital to do outpatient work. On June 30, one of them, Judith Dorsey, of Belgrade, who had worked at Riverview since November 2009, was fired.

The two intensive case managers at the state hospital in Augusta had filed the grievance on behalf of themselves and others, accusing "certain mental health workers" at the state hospital of "deliberately making false statements and interfering with the work of certain social workers." The complaint remains unresolved.

Specifically, it charges that a social worker tried to get money from a hospital safe on Aug. 21, 2013, on behalf of a client so he could have a treat for his birthday.

"The mental health worker who is in charge of the safe refused to give her money and berated her for wasting the money on snacks," the grievance states. "(The) inappropriate comments of the mental health worker were overheard by a witness. In addition, the mental health worker was tired of all the receipts and attempted to throw them away, but (the social worker) intervened and held onto the receipts. Later the mental health worker accused (the social worker) of stealing the money."

The complaint says because the social worker had kept all the receipts, all the money was accounted for.

In another incident, the social workers alleged that a mental health worker incorrectly told people that "the social workers were not allowed to be in a room alone with clients, which resulted in the need for escorts to spend their time unnecessarily sitting in the room with the social workers and clients resulting in a waste of state resources."

A third Riverview social worker, Georgia Gunning, of South China, said she tried to file a grievance alleging a "hostile workplace but was not permitted to do so by union personnel." She said she also attempted to join the Dorsey grievance, and was told she could not do that, either.

She had begun keeping detailed records of various incidents at the hospital and reported to Capitol Police in Augusta that while she was out recovering from injuries she suffered in a traffic accident, her personal items, including office supplies she purchased with her own money, had been stolen from her office cubicle at Riverview.

On July 17, some of the original items and replacements for others were returned to her by a Capitol Police officer who met

with her off hospital grounds.

Mary Anne Turowski, director of politics and legislation for MSEA-SEIU Local 1989, the union that represents social workers at the hospital, including Dorsey and her coworker in the original hostile work environment complaint, said she could not comment on individual grievance and representational issues. MSEA-SEIU Local 1989 represents about 100 of Riverview's 300 or so employees, including nurses and social workers.

"We certainly understand Riverview is a challenging and difficult place to work," Turowski said. "The turnover is great, and pay is inadequate for the work they have to do."

Social workers, including the two who filed the grievance, earn an average of about $20 an hour.

John A. Martins, spokesman for the Department of Health and Human Services, which operates Riverview, said he would not comment on personnel actions, including specific employee actions.

"Providing a safe environment for patients, staff and visitors is essential for Riverview to proceed with the introduction of a recovery-focused model of care and treatment," Martins said in an e-mail sent on behalf of the hospital administration and the department.

"(To that end), the leadership team at (Riverview Psychiatric Center) has been actively engaged in clearly reinforcing the expectations of all employees to concentrate on this mission, (Riverview Psychiatric Center) has a renewed focused on the dignity and recovery of patients in a high-quality, safe environment. Staff actions that do not align with this focus have been handled appropriately."

Martins said the turnover rate for employees at Riverview stands at 18 percent, the same as in 2013. Documents from earlier years show Riverview's worker turnover rate was 12.79 percent in 2005, and was listed as one of the institution's day accomplishments because it showed a decline from 14.29 percent the previous year.

The turnover rate for 2014 includes Mary Louise McEwen, Riverview superintendent for almost five years, who was ousted in March in a department-directed "leadership change." A week later, that job was filled by Jay Harper, who had retired recently as a patient advocate at Riverview, working with the Disability Rights Center. Harper did not respond to an email sent directly to him about the worker complaints.

Turowski said the hospital has taken steps to address the turnover rate.

"As recently as this spring, administration agreed to a recruitment and retention stipend for the nurses," Turowski said, adding it was the second

time this spring, she implemented. "At the end of the day, this impacts the patients. The patients that need a place to get better are impacted by this whole range of challenges."

Two additional women quit their jobs at Riverview this year, saying the stress of working there was too much.

Deidre Dawson, a mental health worker, walked off the job May 20. "When you report something, you are the problem," Dawson said in an interview. "There's bullying and retaliation for you doing that."

Prior to her abrupt departure, she had been using time under the Family Medical Leave Act to deal with the stress. Part of it, she said, was worrying about whether someone would push a button to summon help if she was attacked by a patient.

"Whether we like each other or not, it should be a united front," Dawson said.

Dawson has yet to find a new job and said she needs to "decompress" from 11 years there, adding that she was so stressed out I ran from my phone when it rang."

Tina Ashlock, of Mercer, a registered nurse who had worked the 3-to-11 p.m. shift at Riverview for two and a half years, said the atmosphere was so stressful that she gave two weeks' notice and left on Jan. 31, 2014, without another job lined up. She now works at a nursing home and said she is much happier. Ashlock said she complained about bullying at Riverview on many occasions and was told to stop sending emails about it to the director of nursing.

"She said the hospital has a 'negative culture,' one of no transparency. It is not safe to report anything," Ashlock said. "If you report, you will become the problem."

Sylvie Perry, the field representative for American Federation of State, County and Municipal Employees Council 93, which represents about 110 workers at Riverview, said she was unaware of complaints about a hostile work environment. That union represents mental health workers and "recreation" aides who are direct-care providers.

The grievance by Dorsey and the other social workers was investigated, and in an initial response on Oct. 22, Aimee Rice, the hospital's human resource manager, found no violation of the collective bargaining agreement.

While the state recognizes that there have been "personnel conflicts between the women and certain mental health workers," such behavior does "not meet the level nor definition of 'hostile work environment,'" Rice wrote.

She concluded, "Both the mental health workers and social workers have a responsibility to foster good communica-

tion and teamwork on the unit. It is my belief that both groups have some ownership of this ongoing conflict."

However, on May 12, Dorsey and her coworker were notified that the state Department of Health & Human Services "has determined probable cause to conduct an investigation into allegations of a hostile work environment."

As a result, the two were to be transferred from Riverview's Lower Kennebec unit, which normally houses civil patients versus forensic or crime-related patients, and they were banned from being in the unit. All civil patients can be voluntary or involuntary admissions; forensic patients are at the hospital under a court order because of serious crimes.

The transfer letter was written and signed by Riverview Superintendent Jay Harper. "This is not disciplinary action, but is being taken to allow for the completion of the investigation," Harper said in the letter. It is unclear whether the investigation is complete.

Dorsey said she handed the letters to them. The two women were told they were being moved to the Riverview Assertive Community Treatment Team. They were temporarily placed in offices at the former MaineGeneral Medical Center and given several social work clients, and later they were relocated to Department of Health & Human Services offices at 41 Anthony Ave.

Dorsey was fired June 30 because she allegedly misused case management time while taking a patient shopping. She is grieving that termination through the union as well.

Gunning, who has worked for the state for nearly 15 years, the last one at Riverview, had been out of work for 13 weeks as a result of serious injuries suffered in an April 6 motor vehicle crash. She resumed work June 30 to ensure she could keep her job and health insurance coverage, she said.

Two days later she was placed on administrative leave with pay. A July 2 letter from Harper says the department "has probable cause to conduct an investigation into allegations of a breach of confidentiality regarding client records."

Gunning, who wears a metal brace around her torso because of a fractured vertebrae, denies that.

Ashlock remains seriously concerned about how Riverview patients are faring.

"I had every intention of remaining at Riverview," Ashlock said. "I had many good things to offer them, and they rejected them. There is no way you would get me to go back into that building."

*Betty Adams --- 621-5631*
*badams@centralmaine.com*
*Twitter: @betadams*