# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| JENNIFER TAGHAVIDINANI,     ) <br>     ) <br>    Plaintiff,       ) <br>     ) <br>      v.        ) <br>     ) <br> RIVERVIEW PSYCHIATRIC    ) <br> CENTER, et al.,      ) <br>     ) <br>    Defendants.     ) | **Case No. 1:16-cv-00208-JDL** |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jennifer Taghavidinani, an employee of Riverview Psychiatric Center ("Riverview"), brings this action against Riverview and its former superintendent, Jay Harper, asserting that Riverview and Harper committed retaliation in violation of the Whistleblowers' Protection Act (the "WPA"), 26 M.R.S.A. § 833(3) (2018) (Count I); retaliation in violation of the Maine Human Rights Act (the "MHRA"), 5 M.R.S.A. § 4633 (2018) (Count II); discrimination in violation of the MHRA, 5 M.R.S.A. §§ 4551, *et seq.* (2018) and the Americans with Disabilities Act (the "ADA"); 42 U.S.C.A. §§ 12101, *et seq.* (2018) (Count III); discrimination in violation of the Rehabilitation Act, 29 U.S.C.A. §§ 701, *et seq.* (2018) (Count IV); and retaliation in violation of the First Amendment of the United States Constitution (Count V).

In an order dated July 29, 2016, I granted, in part, the Defendants' Motion to Dismiss (ECF No. 13), resulting in the dismissal of Taghavidinani's claims against Harper with respect to Counts I-IV, and the dismissal of Taghavidinani's claims against Riverview with respect to the ADA. Additionally, I construed Count V as

stating a claim only against Harper, individually, and not against Riverview. Riverview and Harper have now moved for summary judgment (ECF No. 53) with respect to all remaining claims.

## I. FACTUAL BACKGROUND

Riverview Psychiatric Center is a state mental health institute operated by the State of Maine's Department of Health and Human Services. Riverview operates four inpatient hospital units—Upper Kennebec, Lower Kennebec, Upper Saco, and Lower Saco—and an outpatient treatment program. Jay Harper, who is sued in his former capacity as the Superintendent of Riverview, was hired in early 2014.

Taghavidinani is a licensed social worker whom Riverview hired in 2010 as an Intensive Case Manager in Riverview's outpatient treatment program. Taghavidinani was diagnosed with leukemia in late 2010 and was out on medical leave for several months in 2011. When she returned to work, she was assigned to Riverview's Lower Kennebec unit.

In 2013 and 2014, Taghavidinani, along with a colleague who was also employed as a social worker, made various complaints against other Riverview employees employed as mental health workers in the Lower Kennebec unit. Taghavidinani claims that the conflicts arose from acts of bullying and harassment by several mental health workers. Taghavidinani filed a grievance, through her union in 2013 which claimed that there was a hostile work environment at Riverview. ECF No. 46-35, ECF No. 46-36.

Taghavidinani alleges that in April 2014 she also lodged complaints—both verbally and in writing—with her supervisors, in which she reported an unsafe work

2

environment, bullying, and harassment. Among these reports was an e-mail that she allegedly co-wrote with a colleague concerning the care of a patient, "CM." The e-mail, which was sent to two members of Riverview's management from the colleague's email account, questioned the propriety of a relationship between a Riverview staff member and CM. ECF No. 59-2. Additionally, Taghavidinani alleges that she submitted a formal complaint to the Office of Program Evaluation and Government Accountability ("OPEGA"),[1] reporting what she believed to be a hostile work environment for staff members and an abusive environment for patients at Riverview. She also met with OPEGA representatives in person to provide more details about her report. Taghavidinani contends that Harper knew about her report to OPEGA, and that he complained to another Riverview staff member about her "out of control" reports. ECF No. 60 at 15, ¶ 30.

The simmering tension in the Lower Kennebec unit reached a boiling point in May 2014. Early that month, a mental health worker found a sex toy in a candy drawer. The toy was inscribed with an antagonistic note directed at another Riverview mental health worker. Soon thereafter, Harper sent an e-mail to the Human Resources Manager, stating—presumably in reference to the discovery of the sex toy—that there was a "serious allegation of sexual harassment and creating a hostile work environment." ECF No. 46-16. During the ensuing internal investigation, Riverview's management sought to understand and resolve the ongoing conflicts among the staff of the Lower Kennebec unit. As part of the investigation,

---

[1] OPEGA is a legislative office that conducts "independent, objective reviews of State programs and activities with a focus on effectiveness, efficiency and economical use of resources." Office of Program Evaluation and Government Accountability, *Maine State Legislature*, http://www.legislature.maine.gov/opega/.

Harper hand-delivered a letter to Taghavidinani informing her that (1) the Department of Health and Human Services had "probable cause to conduct an investigation into allegations of a hostile work environment;" (2) "[e]ffective immediately," she would be transferred off of the Lower Kennebec unit, not as a "disciplinary action," but instead to "allow for the completion of the investigation;" (3) while transferred, she was "not authorized to work on [the] Lower Kennebec Unit, nor enter the unit for any reason;" and (4) if she needed to speak to anyone, she could contact the Director of Social Work, the Human Resource Manager, or Harper, but otherwise she was "to refrain from contacting <u>any</u> potential witnesses." ECF No. 46-39 (emphasis in original).

Taghavidinani contends that the timing of Harper's letter was suspicious because although the letter was dated Monday, May 12, 2014, Harper allegedly handed her the letter on Friday, May 16, 2014. ECF No. 60 at 13, ¶ 17, ECF No. 46-7 at 38. Taghavidinani further asserts that during the intervening period, Riverview officials learned that the hostile work environment complaint filed on her behalf by her union had been denied, and that she was planning to go to the press and Maine's Center for Medicare and Medicaid Services with reports of what she perceived to be deficiencies and substandard care and administration at Riverview. ECF No. 46-36, 47-9. Ultimately, Riverview's investigation confirmed that Taghavidinani was not in the building on the day the sex toy was discovered and she bore no responsibility for the incident.

Taghavidinani alleges that she was locked-out of her unit and required to turn in her access keys, computers and phones on Monday, May 19. ECF No. 8 at ¶ 52.

The next day Taghavidinani was assigned to work at a different building, on Chestnut Street. The building was under renovation at the time, and Taghavidinani soon reported having a negative physical reaction to it. Following a medical evaluation and recommendation, Taghavidinani was reassigned to another building on Anthony Avenue on about June 19. She alleges that once she was placed at Riverview's Anthony Avenue office in June, she was denied a computer and cell phone for nearly two months. *See* ECF No. 60 at 17, ¶ 52. It is undisputed that during the time Taghavidinani worked at Anthony Avenue, she did not have any job responsibilities related to social work, and the record indicates that she may not have been assigned any work whatsoever.[2] ECF No. 60 at 17, ¶ 52, ECF No. 63 at 16, ¶ 52.

Around this period, Taghavidinani alleges that she spoke with members of the press about her perception of what she believed to be problems at Riverview, and that Harper was aware that she had spoken with reporters. She further alleges that in July, articles appeared in "several newspapers and stories broadcast on many media outlets about Riverview." ECF No. 59 at 3.

In the midst of these events, Taghavidinani's annual performance evaluation was prepared in July. Taghavidinani objected to parts of the completed evaluation, she refused to sign it, and she filed a grievance through her union regarding the evaluation. Riverview does not dispute that, while the grievance was pending,

---

[2] Taghavidinani's supervisor at Anthony Avenue states in her declaration: "I believed that [Taghavidinani] would be doing primarily administrative work while she was at Anthony Avenue because I did not assign her to work with clients. Harper instructed me to give her work to do, but I did not have administrative work for her to do at Anthony Avenue. I thought she might do some work for [the Department of Health and Human Services Office of Substance Abuse and Mental Health Services]." ECF No. 52-2 at ¶ 16. There is no indication in the record that Taghavidinani was assigned any work by or for the Office of Substance Abuse and Mental Health Services.

Taghavidinani's merit pay increase was denied in error, even though she was entitled to the increase based on the disputed performance evaluation. Taghavidinani did not receive her pay increase until May 2015, which was made retroactive to July 1, 2014.

Also in July 2014, while Taghavidinani was working at Anthony Avenue, she requested a transfer to another building, and eventually submitted a request for a reasonable accommodation (ECF No. 46-26) to that effect. Included in the request was her doctor's recommendation that she "cannot be exposed to stressors that exacerbate anxiety. Disallow disparate treatment by coworkers. Provide disability training to coworkers and supervisors. To be treated with dignity and respect. Relocate/transfer." ECF No. 46-26 at 2. In response, two Department of Health and Human Services employees met with Taghavidinani and two of her union representatives on August 1. They discussed the requested accommodation and asked Taghavidinani to supply more information from her healthcare providers. On August 7, Taghavidinani met with Riverview personnel and learned that her accommodation request would be granted on August 11. A Department of Health and Human Services employee sent questionnaires to Taghavidinani's medical providers to gather more information shortly thereafter. Within a few days, the request was granted and Taghavidinani was relocated to Riverview's Lower Saco unit.

On August 14, Taghavidinani left work on medical leave and did not return for two months. When Taghavidinani returned to work on October 27, 2014, she was assigned to the Lower Saco unit, where she was employed and working as of the filing of the Defendants' Motion for Summary Judgment.

## II. SUMMARY JUDGMENT STANDARD

Under the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A genuine issue is one that can be resolved in favor of either party and a material fact is one which has the potential of affecting the outcome of the case." *Gerald v. Univ. of P.R.*, 707 F.3d 7, 16 (1st Cir. 2013) (internal quotation marks omitted); s*ee also Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013). The court, in determining whether the movant has met its burden, views the record in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences. *Brooks v. AIG SunAmerica Life Assurance Co.*, 480 F.3d 579, 586 (1st Cir. 2007). If a party fails to address another party's assertion of fact, the court may "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3); *see also Jaroma v. Massey*, 873 F.2d 17, 19-20 (1st Cir. 1989).

## III. LEGAL ANALYSIS

I address, in turn, Taghavidinani's claims that Riverview retaliated against her in violation of (A) the WPA, and (B) the MHRA; as well as her claims that (C) Riverview discriminated against her in violation of the MHRA and Rehabilitation Act; and (D) that Harper retaliated against her in violation of the First Amendment of the United States Constitution.

## A.  Retaliation under the Whistleblowers' Protection Act (the "WPA"), 26 M.R.S.A. §§ 831, *et seq.*

Taghavidinani alleges unlawful retaliation in violation of the WPA.[3]  Maine's WPA "protects an employee from discrimination when [s]he has complained to the employer in good faith about a workplace-related condition or activity that [s]he reasonably believes is illegal, unsafe, or unhealthy." *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 (1st Cir. 1999).  Specifically, employers may not "discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment[.]" 26 M.R.S.A. § 833(1) (2018).

For her unlawful retaliation claim under Maine's WPA to survive summary judgment, Taghavidinani must make out a prima facie case, demonstrating that "(1) [she] engaged in activity protected by the WPA; (2) [she] experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action." *Brady v. Cumberland Cty.*, 126 A.3d 1145, 1150 (Me. 2015) (internal quotation marks omitted).  The analysis ends there; unlike other employment discrimination claims, alleged violations of Maine's WPA are not subject to a three-step burden-shifting analysis.  *See id.* at 1158-59 (explaining that the *McDonnell Douglas* framework does not apply to the summary judgment stage of WPA retaliation cases); *see also Cote v. T-Mobile USA, Inc.*, 168 F.Supp.3d 313, 331 (D. Me. 2016) ("[T]he Maine Law Court discarded the burden-shifting approach set

---

[3]  Although the WPA does not contain a private right of action, "[t]he MHRA provides a cause of action to persons aggrieved by violations of the []WPA." *Thayer Corp. v. Reed*, No. 2:10 cv-00423-JAW, 2011 WL 2682723 at *18; *see also Tripp v. Cole*, 425 F.3d 5, 9 n.4 (1st Cir. 2005).  Moreover, while the "MHRA is the conduit for []WPA actions . . . courts have consistently applied the language of . . . the []WPA to the elements of the cause of action." *Thayer*, 2011 WL 2682723 at *19 (internal citations omitted).

forth in *McDonnell Douglas* for purposes of summary judgment in Maine Whistleblower Protection Act [] cases."). Thus, if Taghavidinani has presented evidence that would allow a fact-finder to reasonably find in her favor on all three prima facie elements of her case, she can defeat summary judgment.

With respect to the first prong, activities protected under the WPA include, but are not limited to, good faith reports, verbally or in writing, to the employer or a public body, of either (1) "what the employee has reasonable cause to believe is a violation of a law or rule," or (2) "what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual." 26 M.R.S.A. §§ 833(1)(A), 833(1)(B) (2018).

Several of Taghavidinani's actions are protected under the WPA. First, she engaged in protected activity by complaining to Riverview's management, both individually and through her union, of a hostile work environment. *See* ECF No. 59 at 2, ECF No. 60 at 11, ¶¶ 1, 3, 4, 7. Additionally, as a co-author of the "CM e-mail," which reported a possibly improper relationship between a staff member and a patient, Taghavidinani made a written report of what she believed to be a safety risk. *See* ECF No. 59-2. Finally, Taghavidinani's reports to OPEGA constituted reports to a public body of what she believed to be ongoing legal violations and health risks at Riverview, particularly with respect to what she believed to be a hostile and unsafe work environment. *See* ECF No. 60, at 12-15, ¶¶ 11, 28-30, ECF No. 47-4 at 37, ECF No. 46-57, ECF No. 46-58.

Taghavidinani has also alleged several possible adverse employment actions. Adverse employment actions under the WPA must materially change the conditions

of employment by affecting the compensation, terms, conditions, or privileges of employment. *See* 26 M.R.S.A. § 833(1); *see also Sullivan v. St. Joseph's Rehab. & Residence*, 143 A.3d 1283, 1288 (Me. 2016). Qualifying actions deprive the employee of something of consequence: for example, by initiating a demotion in responsibility or a pay reduction, or withholding an accoutrement of employment by, for example, "failing to follow a customary practice of considering [the employee] for promotion after a particular period of service." *Blackie v. Maine,* 75 F.3d 716, 725 (1st Cir. 1996); *see also LePage v. Bath Iron Works Corp.*, 909 A.2d 629, 636 (Me. 2006), *Brady*, 126 A.3d at 1152-1153 (finding that a demotion in position was an adverse employment action).

The adverse employment actions alleged by Taghavidinani are that: (1) she was prohibited from speaking with potential witnesses in an internal investigation and her keycard access was temporarily restricted; (2) she did not receive a timely response to her accommodation request; (3) she was relocated from the Chestnut Street building to the Anthony Avenue building, where she did not perform her social work duties; and (4) she was wrongfully denied her merit pay increase for almost a year. I consider each, in turn.

The first alleged adverse employment action—Riverview's prohibiting Taghavidinani from speaking with potential witnesses in an internal investigation and temporarily restricting her keycard access—does not qualify as an adverse employment action under the WPA. While a reasonable employee may find such restrictions objectionable, the undisputed evidence shows that they were temporary measures used by Riverview to facilitate an internal workplace investigation, the

measures lasted for a single day, and they did not materially change the conditions of Taghavidinani's employment. *See* 26 M.R.S.A. § 833(1) (limiting adverse employment actions to those affecting the "employee's compensation, terms, conditions, location or privileges of employment").

The second alleged adverse action—Riverview's failure to more quickly grant Taghavidinani's July 2014 accommodation request—also does not qualify as an adverse employment action because the accommodation request was actually granted in a timely manner. *See LePage*, 909 A.2d 629, 636 (explaining that showing an adverse employment action requires an allegation that the employee was deprived of "something of consequence" or had an accoutrement of the employment relationship withheld). Riverview granted Taghavidinani's request to relocate or transfer 21 days after its submission.[4] The undisputed facts show that, during the intervening days, Riverview did not ignore the request or let it languish; members of Riverview's management and employees of the Department of Health and Human Services held multiple meetings with Taghavidinani and her union representatives to determine the best way to accommodate the request. Ultimately, the request was granted and Riverview relocated Taghavidinani to the Lower Saco unit.

While the first two alleged adverse employment actions do not qualify as adverse employment actions, the third and fourth allegations—Taghavidinani's being

---

[4] In her Response to Defendants' Motion for Summary Judgment, Taghavidinani characterizes this as the "request for reasonable accommodation on July 18, 2014 through [Taghavidinani's] doctor." ECF No. 59 at 8. A copy of the request submitted to the court as part of the stipulated record shows that someone—presumably Taghavidinani's doctor—wrote "July 18, 2014" on the date-line at the end of the request form. However, the "received" stamp in the upper right hand corner on the same copy indicates that the request was submitted to Riverview on July 21, 2014. ECF No. 46-26. As the request was granted on August 11, 2014, there were 21 days between the date the request was submitted and the date it was granted.

relieved of all social work related duties and the denial of her merit pay increase—do qualify. While Taghavidinani was at Anthony Avenue her supervisor did not assign her any work—including her regular client work and clerical work. *See infra* n.2 (explaining that the record shows that Taghavidinani was not assigned any work by her supervisor, and indicates that she may not have been assigned any work at all during her time at Anthony Avenue); *see also* ECF No. 52 at 15, ¶ 105, ECF No. 60 at 6, ¶ 105, 14, ¶ 23, 17, ¶ 52, ECF No. 63 at 9, ¶ 23, 16, ¶ 52, ECF No. 52-2 at 16. By Riverview's own admission, Taghavidinani was provided no opportunity to apply her social work skills while at Anthony Avenue. *See* ECF No. 60 at 17, ¶ 52, ECF No. 63 at 9, ¶ 52. Because Taghavidinani has demonstrated that she was not permitted to perform the type of work that was central to her position as an intensive case manager, she has presented evidence of a material change in the terms of her employment.[5] *See Morales-Vallellanes v. Potter*, 605 F.3d 37, 35 (1st Cir. 2010) (categorizing an employee's "reassignment with significantly different responsibilities" as a material change in the terms of employment in the context of a Title VII claim). Thus, Taghavidinani's experience at Anthony Avenue qualifies as an adverse action under the WPA. *See Puno*, 2007 WL 1875830, at *10 n.12 (noting that actions adversely affecting the terms of employment are within the purview of the WPA).

The frozen merit pay increase also constitutes an adverse employment action. The undisputed evidence shows that Taghavidinani was entitled to a merit increase

---

[5] The record indicates that Taghavidinani's role as an "intensive case manager" was a position that involved her skills as a social worker. *See* ECF No. 52 at 3, 4, 10, 11.

in July 2014, but Riverview, by its own admission, erroneously did not pay Taghavidinani the merit increase until May 2015. ECF No. 52 at 19, ¶ 135; ECF No. 60 at 8, ¶ 135. Thus, she was deprived of the benefit of her pay increase for nearly a full year. As such, the failure to pay her merit increase constitutes an adverse employment action as contemplated by the WPA. *See* 26 M.R.S.A. § 833(1) (establishing that actions affecting an employee's compensation are considered adverse employment actions); *see also LePage*, 909 A.2d at 636 (explaining that withholding an accoutrement of the employment relationship constitutes an adverse employment action).

The third and final prong of a WPA retaliation claim requires Taghavidinani to articulate a causal connection between her protected activities and Riverview's alleged adverse employment actions. Taghavidinani must be able to show that retaliation was a substantial motivating factor when Riverview reassigned her with significantly different job responsibilities and failed to pay her merit increase. *See Cormier v. Genesis Healthcare LLC*, 129 A.3d 944, 950 (Me. 2015). In making that showing, "[t]emporal proximity of [Riverview's] awareness of protected activity and the alleged retaliatory action may serve as the causal link for purposes of [Taghavidinani's] prima facie case." *Id.* at 951 (quoting *Daniels v. Narraguagus Bay Health Care Facility*, 45 A.3d 722, 728 (Me. 2012); *see also Murray v. Kindred Nursing Ctrs. W., LLC*, 789 F.3d 20, 25 ("Under Maine law, close temporal proximity between the protected activity and the adverse action is a sufficient showing of causation for the purpose of establishing a plaintiff's prima facie case.").

Here, the temporal proximity is apparent: Taghavidinani's protected activities largely occurred in the late spring and early summer of 2014, she was relocated to Anthony Avenue in June 2014, and Riverview failed to pay her merit increase beginning in July 2014. Riverview disputes any causal connection. According to Riverview, the Anthony Avenue supervisor failed to assign any work to Taghavidinani because of a patient complaint that was received during the summer of 2014, which caused her supervisor to lose trust in Taghavidinani's ability to perform social work duties. *See* ECF No. 53 at 4. However, given the temporal proximity between Taghavidinani's protected activities and the suspension of her social work responsibilities, a jury could reasonably infer that Taghavidinani was deprived of her social work duties in response to her protected activities. *See Brooks*, 480 F.3d at 586 ("We review the grant of summary judgment de novo, viewing all facts and reasonable inferences therefrom in favor of the non-moving party.").

The dispute with respect to causation for the withheld merit increase unfolds in a similar fashion. Riverview claims that the merit increase was not paid due to an innocent mistake unrelated to Taghavidinani's protected activity, and thus disclaims any intent to retaliate against Taghavidinani, but a jury could reject Riverview's explanation and find that the payment was withheld as a form of punishment. *See* ECF No. 53 at 4. Because the temporal connections between the protected activities and adverse employment actions are sufficient to infer causation, Taghavidinani has made out a prima facie case with respect to her WPA claim and Riverview is not entitled to summary judgment.

**B.**   **Retaliation under the Maine Human Rights Act (the "MHRA"), 5 M.R.S.A. §§ 4551, *et seq.***

Taghavidinani also alleges retaliation in violation of the MHRA.  The MHRA prohibits retaliation where an "individual has opposed any act or practice that is unlawful under [the MHRA] or because that individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under [the MHRA]."  5 M.R.S.A. § 4633(1) (2018).  "To establish a prima facie case of retaliation in violation of the MHRA, an employee must demonstrate that he engaged in a statutorily protected activity, that [the employer] made an employment decision that adversely affected him, and that there was a causal link between the two." *Porietis v. Tradesmen Int'l, LLC*, 227 F. Supp.3d 126, 137 (D. Me. 2017) (internal quotation marks omitted).  At the summary judgment stage, there must be trialworthy evidence that the retaliation was tied to one of the MHRA's protected categories.[6]  *Id.*

A plaintiff seeking redress for retaliation under the MHRA must demonstrate that she engaged in a statutorily protected activity.  Here, Taghavidinani alleges one statutorily protected activity: her written request for a reasonable accommodation in July 2014.  ECF No. 59 at 8.  The parties agree that on at least one occasion prior to submitting the written accommodation request, Taghavidinani requested a transfer from Anthony Avenue to another location.  ECF No. 52 at 20, ¶¶ 136-137, ECF No.

---

[6] With respect to employment, protected categories under the MHRA include race, color, sex, sexual orientation, physical or mental disability, religion, ancestry or national origin, as well as age, and a previous assertion of a claim or right under former Title 39 or Title 39-A.  5 M.R.S.A. § 4552 (2018).

60 at 8, ¶¶ 136-137.  In the written request, Taghavidinani's doctor wrote that she "cannot be exposed to stressors that exacerbate anxiety.  Disallow disparate treatment by coworkers.  Provide training to coworkers and supervisors.  To be treated with dignity and respect.  Relocate/transfer."  ECF No. 46-26 at 2.  Viewing the facts in the light most favorable to Taghavidinani, her doctor's note qualifies as a written accommodation request related to a previously known disability and was, therefore, statutorily protected under the MHRA.  *See Doyle v. Dep't of Human Servs.*, 824 A.2d 48, 56 (Me. 2003) (quoting 5 M.R.S.A. § 4553(2)(E) (2002)).

The next step of the MHRA analysis requires a showing that the employer made an employment decision that adversely affected the employee.  An adverse employment action in an MHRA retaliation claim must be "materially adverse," meaning it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 36 (1st Cir. 2011) (internal quotation marks omitted).  Material actions "produce a significant, not trivial, harm," and "actions like petty slights, minor annoyances, and simple lack of good manners will not [normally] create such deterrence."  *Id.* at 36-37 (internal citation and quotation marks omitted).

Here, the undisputed facts fail to demonstrate an adverse employment action.  Riverview responded to Taghavidinani's request within two weeks; on August 1, 2014, two members of the Department of Health and Human Services met with Taghavidinani and two of her union representatives, at which point they discussed the July 2014 accommodation request and asked her to gather more information from her healthcare providers.  ECF No. 52 at 20-21, ¶¶ 141, 142; ECF No. 60 at 8, ¶¶ 141,

142. On August 7, Taghavidinani met with Riverview officials and learned that the accommodation request would be granted on August 11. ECF No. 52 at 21, ¶ 143; ECF No. 60 at 8, ¶ 143. On August 8, a Department of Health and Human Services employee sent questionnaires to Taghavidinani's medical providers to gather more information. ECF No. 52 at 21, ¶ 145; ECF No. 60 at 9, ¶ 145. The request was granted on August 11, 2014, when Taghavidinani was relocated to the Lower Saco unit at Riverview. ECF No. 52 at 21, ¶ 147; ECF No. 60 at 9, ¶ 147.

Although Taghavidinani alleges that the time lapse between the accommodation request and her relocation constituted an adverse employment action, she has failed to demonstrate a genuine dispute of material fact with respect to the issue. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). It is undisputed that Riverview granted Taghavidinani's July 2014 request for relocation or transfer less than a month after its submission, and, in the meantime, Riverview and the Department of Health and Human Services held meetings at which the request was discussed and Taghavidinani was assured that it was being actively considered. Taghavidinani does not articulate facts that, if true, show that the 21-day period between the request and its approval produced a significant, as opposed to trivial, harm. *See Colón-Fontánez*, 660 F.3d at 36 (defining adverse employment actions under the MHRA as those that "produce a significant, non-trivial harm"). Thus, because the undisputed facts establish that there was no adverse employment action, Riverview is entitled to

summary judgment on Taghavidinani's claim for retaliation in violation of the MHRA.

## C. Discrimination in Violation of the MHRA and the Rehabilitation Act, 29 U.S.C.A. §§ 701, *et seq.*

Taghavidinani alleges that Riverview discriminated against her based on her disability in violation of the MHRA and the Rehabilitation Act, 29 U.S.C.A §§ 701, *et seq.* (2018). This claim is separate from her claim for retaliation in violation of the MHRA. *See* ECF No. 8 at 19, 20. Although Taghavidinani did not object to Riverview's Motion for Summary Judgment with respect to these claims, I may not automatically award summary judgment for that reason alone. *See McDermott v. Lehman*, 594 F.Supp. 1315, 1320 (D. Me. 1984). Rather, under Federal Rule of Civil Procedure 56(e), summary judgment is only appropriate if "the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e); *see also Jaroma*, 873 F.2d at 19-20 (1st Cir. 1989) (per curiam).

"To establish a prima facie case of disability discrimination pursuant to the MHRA, the plaintiff has the burden of establishing the following: first, she suffers from a disability; second, she is otherwise qualified, with or without reasonable accommodations, and is able to perform the essential functions of the job; and third, she was adversely treated by the employer based in whole or in part on her disability." *Doyle*, 824 A.2d 48, 54 (Me. 2003). The standard for making out a case of disability discrimination pursuant to the Rehabilitation Act is identical. *See Ríos-Jiménez v. Principi*, 520 F.3d 31, 41 (1st Cir. 2008). In this context, an adverse employment action is defined broadly to include "any material disadvantage[] in respect to salary,

grade, or other objective terms and conditions of employment." *Carmichael v. Verso Paper, LLC*, 679 F.Supp. 109, 131 (D. Me. 2010) (internal quotation marks omitted).

Here, Taghavidinani suffers from a disability. *See* ECF No. 52 at 3, ¶ 12, ECF No. 60 at 1, ¶ 12. Additionally, given that she has been employed as a social worker at Riverview for at least seven years it is reasonable to infer that she is able to perform the essential functions of her job. *See* ECF No. 52 at 1, ¶ 3, ECF No. 60 at 1, ¶ 3. I thus focus on the third prong of the disability discrimination analysis regarding proof of adverse treatment by the employer based on the disability.

Again, Taghavidinani alleges four adverse employment actions: (1) that Riverview prevented her from speaking with potential witnesses in an internal investigation and temporarily restricted her keycard access; (2) that Riverview did not timely respond to her accommodation request; (3) that Riverview relocated her from the Chestnut Street building to a location on Anthony Avenue and changed her job responsibilities; and (4) that Riverview wrongfully denied her merit pay increase for almost a year. None of the facts asserted by Taghavidinani in the summary judgment record suggest a causal connection between any of these actions and her disability. *See Doyle*, 824 A.2d 48, 54 (Me. 2003) (requiring plaintiffs making out a prima facie case of discrimination under the MHRA to show that the adverse action was based, in whole or in part, on a disability). Accordingly, Riverview is entitled to summary judgment with respect to the claims of discrimination in violation of the MHRA and the Rehabilitation Act. *See* Fed. R. Civ. P. 56(e).

**D.     Retaliation in Violation of the First Amendment of the United States Constitution**

Taghavidinani alleges that her First Amendment rights were violated because Harper, Riverview's superintendent in 2014, initiated an adverse employment action which she claims was in response to her protected speech.  This claim proceeds only against Harper, individually, and not against Riverview.  *See* ECF No. 13 at 2, ECF No. 9 at 2.

Taghavidinani contends that when Harper prohibited her from contacting potential witnesses in the internal investigation and restricted her keycard access—actions she characterizes as a "gag order" and "lockout," respectively—he engaged in an unconstitutional effort to punish her for making reports to OPEGA and the press, and thus violated the First Amendment.  ECF No. 59 at 9-10.  Because Harper is a public official being sued for money damages in his individual capacity, Riverview contends that Harper is protected by qualified immunity.  ECF No. 53 at 37-38; *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

A qualified immunity analysis consists of two parts: the first asks whether Taghavidinani alleges facts that, if true, demonstrate violations of a constitutional right, and the second asks whether that right was clearly established at the time of the alleged violations.  *See Stamps v. Town of Framingham*, 813 F.3d 27, 33-34 (1st Cir. 2016); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  The second part, in turn, has two components: (1) were the "legal contours of the right in question" sufficiently clear so a reasonable official would understand what was a violation, and (2) within the case's factual context, would a reasonable official understand at what point his or her conduct violated the right?  *Stamps*, 813 F.3d at 34.  So long as the

defendant is "not contravening clearly established law, [the Defendant is] entitled to qualified immunity." *Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (per curiam). I proceed directly to the second component, asking whether a reasonable superintendent in Harper's position could have been uncertain as to whether his actions infringed on Taghavidinani's constitutional rights. *See Pearson*, 555 U.S. at 236 ("The judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

At the time of the alleged violations, Harper was overseeing an internal investigation into allegations of sexual harassment and a hostile work environment, *see* ECF No. 46-16, involving a group of employees who had a history of conflict. Given this context, it was not unreasonable for a superintendent in Harper's position to believe that the initial step he took to investigate allegations of workplace harassment—physically separating the employee who was embroiled in the ongoing conflict from her coworkers for one day—did not infringe on the constitutional rights of that employee. Qualified immunity ultimately shields "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The record does not indicate that Harper falls into either of those categories; rather, the undisputed facts plainly reflect that his actions were a reasonable first step to investigate and quell a workplace dispute. Because it was far from certain that Harper's response infringed Taghavidinani's First Amendment rights to any

appreciable degree, Harper's actions fall within the protection afforded by qualified immunity.  Accordingly, Taghavidinani's First Amendment claim cannot survive summary judgment.

## IV.  CONCLUSION

For the reasons explained above, Riverview's Motion for Summary Judgment (ECF No. 53) is **DENIED** as to Count I, retaliation in violation of the Whistleblowers' Protection Act, and **GRANTED** as to (a) Count II, retaliation in violation of the Maine Human Rights Act; (b) Count III, discrimination in violation of the Maine Human Rights Act; (c) Count IV, discrimination in violation of the Rehabilitation Act; and (d) Count V, retaliation in violation of First Amendment of the United States Constitution.

**SO ORDERED.**

**Dated this 5th day of March, 2018.**

**/s/ JON D. LEVY**
**U.S. DISTRICT JUDGE**
